RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NESTOR BARRON (18-5222); JORGE DE JESUS MACIAS
PEDROZA (18-5515),

*Defendants-Appellants*.

Nos. 18-5222/5515

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:17-cr-00101—Danny C. Reeves, District Judge.

Argued:  June 26, 2019

Decided and Filed:  October 15, 2019

Before:  COLE, Chief Judge; SILER and CLAY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for Appellant
in 18-5222.  Dan Carman, Lexington, Kentucky, for Appellant in 18-5515.  Meghan Stubblebine,
UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.  **ON BRIEF:**
Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for Appellant in 18-5222.
Dan Carman, Lexington, Kentucky, for Appellant in 18-5515.  Meghan Stubblebine, Charles P.
Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

COLE, C.J., delivered the opinion of the court in which CLAY, J., joined, and SILER, J.,
joined in part.  SILER, J. (pg. 22), delivered a separate opinion concurring in part and dissenting
in part.

————————————

**OPINION**

————————————

COLE, Chief Judge.  In the fall of 2016, law enforcement agents in Lexington, Kentucky, began investigating Fernando Rafael Lara Salas for drug-trafficking activities.  During the investigation, officers learned that Lara Salas was associated with Defendants Jorge de Jesus Macias Pedroza and Nestor Barron.  Barron and Macias Pedroza were indicted for drug-related crimes.  Barron pleaded guilty to conspiracy to distribute cocaine, and the district court sentenced him to a mandatory minimum sentence of ten years' imprisonment.  Because Barron is entitled to relief under the safety-valve statute, we vacate his sentence and remand for resentencing.  Macias Pedroza was found guilty by a jury of various drug and firearm charges, and because the trial court adequately instructed the jury regarding dual-role testimony, we affirm his conviction.

## I.  BACKGROUND

In July of 2017, law enforcement officers executed three search warrants as part of a drug-trafficking investigation—one at Fernando Rafael Lara Salas's residence, one at Jorge de Jesus Macias Pedroza's residence, and one at a trailer that the two men used for construction work.  At Lara Salas's home, officers discovered Nestor Barron in an upstairs bedroom.  Both Macias Pedroza and Barron were indicted for drug-related crimes.  Barron pleaded guilty to conspiracy to distribute cocaine and Macias Pedroza was found guilty by a jury of various drug and firearm charges.  Barron now appeals his sentence, and Macias Pedroza appeals his conviction.  The two cases were consolidated and we address the facts of each in turn.

### A.  Barron

Around 8:30 a.m. on July 18, 2017, officers executed a search warrant at Lara Salas's residence in Lexington, Kentucky.  Lara Salas was in bed in a downstairs bedroom and Barron was in bed in an upstairs bedroom, where officers also found an unidentified woman.  The woman, Barron, and Lara Salas were all detained while officers conducted a search of the house.

In the upstairs bedroom where Barron and the woman were found, officers discovered a black duffle bag under the bed that contained six bricks of a substance they believed to be drugs. The bricks were later tested and confirmed to be cocaine, with a net weight of 6.043 kilograms. On top of the bricks of cocaine, officers found $105,375 in the bag. Officers also found approximately 1,600 pills containing methamphetamine and MDA hidden inside a DVD player.

At some point, after almost everything had been removed from drawers and placed in piles on the bed and floor, Detective Bowles conducted a secondary search of the upstairs bedroom. Underneath clothing, he discovered a box containing 26 rounds of nine-millimeter caliber ammunition. The room was very cluttered, and none of the officers involved in the initial search of the bedroom saw the box of ammunition. According to Bowles, he only found the ammunition after moving piles of clothing and other items, and it appeared to him that the box had been potentially set aside for collection. The record does not indicate where the ammunition was located during the primary search of the room.

Finally, in addition to the drugs, money, and ammunition, the officers discovered personal documents for three different individuals during the search of the upstairs bedroom. First, officers found Barron's wallet with his identification card and birth certificate inside, as well as a bus ticket in Barron's name, showing that he traveled from Los Angeles, California, to Lexington, Kentucky, on May 26, 2017. Second, officers discovered Lara Salas's passport and the vehicle registration for Lara Salas's car. And third, officers found a wallet with identification documents for a woman.

In the downstairs bedroom—where officers found Lara Salas in bed—law enforcement agents discovered a Jimenez semiautomatic nine-millimeter pistol in the drawer of a dresser located within arm's reach of the bed. The firearm was loaded with nine rounds of Luger ammunition, the same type of ammunition found in the upstairs bedroom. The officers also discovered cash banded together in a manner similar to the money in the duffel bag, plastic baggies with cut corners, Lara Salas's identification card, and utility bills in his and his wife's name.

After officers conducted the search, DEA Special Agent Jason Moore conducted an interview of Barron. During the interview, Barron stated that he thought the bricks were cocaine and acknowledged that his fingerprints might be on the drugs. He said that he was paid approximately $150 by Lara Salas to pick up the cocaine on a street in Lexington on July 13 or 14. Barron stated that he met with a black male who was traveling from Cincinnati, Ohio, for approximately a minute and a half to complete the transaction, and he gave a physical description of the man he met with, but no name. Barron was then shown a picture of Robbie Warren, a suspected drug trafficker in Cincinnati who had been seen with Lara Salas on prior occasions. Barron asked "why he had to identify [the man in the photograph] if they already knew who he was," but then identified Warren as the person from whom he obtained the drugs. (Presentence Report, R. 132, PageID 937.)

During the interview, Barron also told Agent Moore that he was from Los Angeles and that he and his girlfriend had been in Lexington for a little over one month. They were both staying at Lara Salas's house, and Barron stated that he and Lara Salas were friends and had known each other for a number of years. Lara Salas was also interviewed, and he denied any knowledge of the drug activity but admitted that he owned the firearm. He stated that he purchased the firearm in the Cardinal Valley neighborhood for $300 or $350 and that he owned the gun for safety.

Based on the search and interviews, Barron was indicted and pleaded guilty to one count of conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. The plea agreement contemplated a base offense level of 30, noted that a two-level reduction may be warranted if the court determined that Barron satisfied the safety-valve criteria set forth in United States Sentencing Guidelines §§ 2D1.1(c)(17) and 5C1.2(1)–(5), and anticipated a two- or three-level decrease for acceptance of responsibility.

The presentence report agreed with the recommended base offense level of 30 and deducted three levels for acceptance of responsibility. The probation office, however, recommended applying a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm and thus calculated Barron's offense level as 29. Because Barron had no previous criminal history, his criminal history category was I, translating to an advisory Guidelines range

of 87 to 108 months' imprisonment.  But pursuant to 21 U.S.C. § 841(b)(1)(A), Barron faced a mandatory minimum sentence of 120 months, unless the court determined that Barron met the criteria for application of the safety valve.  The presentence report stated that because Barron did not actually possess the firearm, he may be eligible for relief under the safety valve.

At sentencing, the district court, over Barron's objection, concluded that it was reasonably foreseeable to Barron that another member of the conspiracy would have possessed a firearm and thus applied U.S.S.G. § 2D1.1(b)(1)'s two-level increase.  The court also found that Barron did not meet the criteria for application of the safety valve for two reasons.  First, the court found that Barron aided and abetted Lara Salas in the possession of a weapon in connection with the drug-trafficking offense, specifically by assisting him in acquiring ammunition.  Second, the district court found that Barron did not qualify for relief under the safety valve because he did not provide truthful information to the government regarding the conspiracy.  The court sentenced Barron to the mandatory minimum sentence of ten years.

Barron timely appealed his sentence.

**B.  Macias Pedroza**

The same day officers executed the search warrant at Lara Salas's residence, they executed a warrant at Macias Pedroza's residence in Lexington, Kentucky.  There, officers found a pair of digital scales, at least one of which had white residue.  The substance on the scale field-tested positive for cocaine, but the scale was not submitted to a laboratory for final testing.  In addition to the scales, the officers found latex gloves, drug packaging materials, a small amount of marijuana, and a pistol.

A third search warrant was executed a few days later at a trailer that law enforcement officers had previously observed Macias Pedroza and Lara Salas using for construction work.  In the trailer, officers found four kilograms of a substance that initially field-tested positive for cocaine, but was later determined through laboratory testing to be tramadol.  Some of the tramadol was marked with a "V," as was at least one kilogram of the cocaine found at Lara Salas's residence.  In addition to the tramadol, officers discovered kilo-sized shrink wrap with a

residual amount of a suspected controlled substance that later tested positive for the presence of fentanyl, as well as green shrink wrap, and a hollowed-out cooler.

Macias Pedroza and Lara Salas were subsequently indicted.  Macias Pedroza was charged with six counts in the indictment:  conspiracy to distribute cocaine, being an alien in possession of a firearm, possession with intent to distribute tramadol, possession with intent to distribute fentanyl, possession with intent to distribute methamphetamine, and possession with intent to distribute MDA.

The case proceeded to trial.  Prior to trial, Macias Pedroza moved to exclude any evidence related to the results of the field testing of the scale found in his home, arguing that the testing was inherently unreliable.  For support, Macias Pedroza pointed to the fact that the substance found in the trailer field-tested positive for cocaine but turned out to be tramadol.  The district court rejected the motion.  Macias Pedroza renewed his objection at trial and the court again rejected his argument.

At trial, Matthew Evans, a narcotics detective with the Lexington Police Department, testified that he believed the residue on the scale was cocaine.  Evans further testified that the substance field-tested positive for cocaine, but explained that field tests are not definitive.  Evans stated that substances are typically sent to the lab for drug testing after a field test, but the scale was not.  In addition to testifying about the substance on the scale, Evans testified about the drug-trafficking investigation, including his surveillance of Macias Pedroza and Lara Salas and the execution of the warrant at Lara Salas's residence.

Prior to submitting the case to the jury, the district court gave the jury an instruction regarding how to consider testimony of law enforcement officers who testified to both facts and opinions.  The jury found Macias Pedroza guilty of all counts.  The district court sentenced him to 188 months' imprisonment.

Macias Pedroza timely appealed his conviction.

## II.  ANALYSIS

Barron challenges his sentence and Macias Pedroza challenges his conviction.  Both challenges are analyzed separately below.

### A.  Barron

#### *1.  Firearm Enhancement*

Barron first argues that the district court clearly erred in applying the two-level enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1).  That section provides for a two-level increase in a defendant's base offense level "[i]f a dangerous weapon (including a firearm) was possessed."  U.S.S.G. § 2D1.1(b)(1).  "[T]he government has the burden of showing 'by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense.'" *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (quoting *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007)).

In the conspiracy context, we have "found that 'possession of a gun by one coconspirator is attributable to another coconspirator if such possession constitutes reasonably foreseeable conduct.'" *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994) (quoting *United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir. 1992)); *see also* U.S.S.G. § 1B1.3(a)(1)(B).  "The test as to whether conduct is reasonably foreseeable is an objective one." *Cochran*, 14 F.3d at 1132.  It is the government's burden to prove by a preponderance of the evidence that it was reasonably foreseeable to a defendant that a co-conspirator would possess a firearm. *United States v. Woods*, 604 F.3d 286, 290 (6th Cir. 2010).

The district court applied the two-level firearm enhancement to Barron's sentence because it concluded that it was reasonably foreseeable that Lara Salas would possess a firearm. This is a factual finding that we review for clear error. *United States v. Randolph*, 794 F.3d 602, 614 (6th Cir. 2015).  "A factual finding is clearly erroneous when the [c]ourt, on reviewing the evidence, is left with the definite and firm conviction that a mistake has been committed."

*United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017) (internal quotations and citation omitted).

We are not left with such a conviction here. If the only evidence in the record supporting the enhancement was the ammunition discovered in Barron's bedroom, we may have come to a different conclusion. The evidence shows that Lara Salas and another woman also kept personal belongings in the bedroom, and there is no evidence indicating that Barron had any knowledge of the box of ammunition that was covered by clothes. The parties stipulated that the room was very cluttered and the box of ammunition was not out in the open when the officers initially searched the bedroom. When the detective found the ammunition, it appeared to him that the box had been potentially set aside for collection, and the government presented no evidence as to where the box of ammunition was originally discovered in the room. It is thus not clear that Barron had any reason to know about the ammunition in the bedroom of Lara Salas's home.

But other evidence in the record supports the district court's application of the enhancement—namely, the large quantity of drugs under Barron's bed. It is true, as Barron points out, that we have "explicitly rejected the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions." *Woods*, 604 F.3d at 291 (quoting *Catalan*, 499 F.3d at 607). "Rather, at a minimum, we require that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed." *Cochran*, 14 F.3d at 1133. We have also held, however, that the *quantity* of drugs and cash involved in a conspiracy may make the possession of a firearm reasonably foreseeable. *See Woods*, 604 F.3d at 291 ("[W]e have declined to find clear error in a district court's conclusion that possession of a firearm was reasonably foreseeable when there are massive amounts of drugs in a single location."); *United States v. Wade*, 318 F.3d 698, 702 (6th Cir. 2003) ("We are willing to infer that a coconspirator's firearm possession is foreseeable based solely on the quantity of drugs involved only when the quantity of drugs at issue is so large that the participants would expect others to be carrying protection."). Cases where we have concluded that the quantity of drugs in a single location properly led to a finding of reasonable foreseeability "involved narcotics worth at least $60,000 located near the firearm." *See Woods*, 604 F.3d at 291 (discussing cases).

Here, the district court noted that the six kilograms of cocaine found under the bed Barron was sleeping in "would be worth in excess of $200,000, thereabouts, 30 to 35,000 a kilo for six kilos." (Sentencing Hr'g Tr., R. 140, PageID 1089.) We have already held that the presence of similar—indeed, lower—quantities of drugs is sufficient to make the presence of a gun reasonably foreseeable to a co-conspirator. *See United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994) ("When an individual conspires to take part in a street transaction involving a kilogram of cocaine worth $39,000, it certainly is quite reasonable to assume that a weapon of some kind would be carried.") (internal quotations and citation omitted); *United States v. Christian*, 942 F.2d 363, 368 (6th Cir. 1991) (holding foreseeability of firearm was "not too attenuated" when the parties "agreed to exchange $60,000 for three kilograms of cocaine"), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). We therefore conclude that the district court did not clearly err in applying an enhancement under U.S.S.G. § 2D1.1(b)(1).

### 2. Safety Valve

Barron next contends that the district court erred in declining to apply the safety-valve provisions of U.S.S.G. §§ 5C1.2 and 2D1.1(b)(17). In general, if a defendant is convicted under 21 U.S.C. § 841(b)(1)(A), he faces a statutory mandatory minimum sentence of 120 months. But "Congress became concerned that the inflexibility of statutory mandatory minimum sentences was resulting in unjust punishments in some cases" and enacted 18 U.S.C. § 3553(f). *United States v. Adu*, 82 F.3d 119, 121 (6th Cir. 1996); *see also* H.R. Rep. 103-460 (1994) (explaining that the safety-valve provision was enacted to prevent mandatory minimums from causing the "least culpable offenders [to] receive the same sentences as their relatively more culpable counterparts"). "This 'safety valve' statute gave the United States Sentencing Commission the authority to promulgate a Sentencing Guideline to effectuate the purposes of the statute [and] [t]he Sentencing Commission has promulgated such a Guideline in the form of USSG § 5C1.2." *United States v. Bazel*, 80 F.3d 1140, 1141 (6th Cir. 1996).

Section 5C1.2 of the Guidelines provides relief from the mandatory minimum if a defendant meets five criteria:

(1) the defendant does not have more than 1 criminal history point . . . ;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise . . . ; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a); *see also* 18 U.S.C. § 3553(f). A defendant bears the burden of proving by a preponderance of the evidence that he is entitled to relief under the safety valve. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004). In order to do so, he must show that he meets "each and every criterion." *Bazel*, 80 F.3d at 1142 (quotation marks and alteration omitted). If a defendant meets his burden, application of the safety valve is mandatory: a district court is "*require[d]*" to "sentence a defendant within the guideline applicable guideline range *without regard to the statutory minimum sentence*." *United States v. Patterson*, 145 F. App'x 988, 990–91 (6th Cir. 2005) (emphasis in original). Additionally, the Guidelines provide that if a defendant meets the safety-valve criteria set forth in § 5C1.2, his base offense level is decreased by two levels. U.S.S.G. § 2D1.1(b)(17) (2016).[1]

A district court's "refusal to apply U.S.S.G. § 5C1.2 [is] a factual finding subject to review for clear error." *Adu*, 82 F.3d at 124. It is undisputed that Barron meets the first, third, and fourth criteria of the safety valve. The only issues are whether he meets the second and fifth

---

[1]Barron was sentenced based on the 2016 version of the Guidelines, which provide for this two-level reduction in section § 2D1.1(b)(17). Under the current version of the Guidelines, the reduction is found in U.S.S.G. § 2D1.1(b)(18).

criteria—whether he possessed a firearm in connection with the offense and whether he truthfully provided all information he had about the offense to the government.

### a. Possession of a Firearm

As an initial matter, we are not precluded from concluding that Barron meets this prong of the safety-valve statute merely because we upheld a firearm enhancement under § 2D1.1(b)(1).  We have already held that "a defendant's conduct warranting a § 2D1.1(b)(1) enhancement does not *per se* preclude that defendant from proving by a preponderance of the evidence that his possession of the firearm was not connected with his offense for purposes of a § 5C1.2(a) 'safety valve' reduction." *Bolka*, 355 F.3d at 914.

Barron is correct that unlike in the § 2D1.1(b)(1) context, the district court cannot rely solely on the foreseeability of a co-defendant's possession to render a defendant ineligible for relief under the safety valve.  Although we have not ruled previously on this issue, the seven circuits that have considered the issue have unanimously agreed that possession of a firearm by a co-conspirator does not render a defendant ineligible for relief under the safety valve.[2]  We now join them for three reasons.

First, the language of the Guidelines limits consideration to the defendant's own actions. *See* U.S.S.G. § 5C1.2(a)(2) (requiring that a "*defendant* did not . . . possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense") (emphasis added).  The firearm enhancement under U.S.S.G. § 2D1.1(b), on the other hand, "uses the passive voice—requiring enhancement if a firearm 'was possessed,' . . . —and omits any reference to the defendant." *In re Sealed Case*, 105 F.3d at 1463 (quoting U.S.S.G. § 2D1.1(b)(1)).

---

[2]*See United States v. Figueroa-Encarnacion*, 343 F.3d 23, 34–35 (1st Cir. 2003); *United States v. Wilson*, 114 F.3d 429, 432 (4th Cir. 1997); *United States v. Wilson*, 105 F.3d 219, 222 (5th Cir. 1997); *United States v. Delgado-Paz*, 506 F.3d 652, 655–56 (8th Cir. 2007); *United States v. Pena-Sarabia*, 297 F.3d 983, 989 (10th Cir. 2002); *United States v. Clavijo*, 165 F.3d 1341, 1343 (11th Cir. 1999); *In re Sealed Case (Sentencing Guidelines' Safety Valve)*, 105 F.3d 1460, 1462 (D.C. Cir. 1997).

Second, the application notes to § 5C1.2 of the Guidelines specifically "limit[] the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 5C1.2 cmt. n.4. Indeed, this wording in the application notes "parallels the wording of one of the two principal provisions defining the scope of relevant conduct for which defendants are held liable under the Guidelines." *In re Sealed Case*, 105 F.3d at 1462; *see* U.S.S.G. § 1B1.3(a)(1)(A) (referencing "all acts and omissions [a defendant] committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused"). "Notably absent" from the application notes, however, "is any mention of the other principal provision defining the scope of relevant conduct, which holds defendants liable for 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *In re Sealed Case*, 105 F.3d at 1462 (quoting U.S.S.G. § 1B1.3(a)(1)(B)). It is that "reasonably foreseeable language that allows a defendant to be held responsible for a firearm under section 2D1.1(b)(1) even when he physically possessed no firearm." *Clavijo*, 165 F.3d at 1343.

And third, allowing a defendant to be charged with possession of a co-conspirator's gun under § 5C1.2 would be "contrary to the congressional policy underlying the mandatory minimum safety valve," which is "to permit courts to sentence less culpable defendants to sentences under the guidelines, instead of imposing mandatory minimum sentences." *Pena-Sarabia*, 297 F.3d at 988 (internal quotations and citations omitted). Because of "the great likelihood that at least one member of a drug distribution conspiracy will possess a firearm, . . . incorporating co-conspirator liability into the safety valve's weapon possession element would render the safety valve virtually useless." *In re Sealed Case*, 105 F.3d at 1463. We thus conclude that a defendant cannot be charged with possession of a co-conspirator's firearm under § 5C1.2 merely because it was reasonably foreseeable that his co-conspirator would possess one.

The district court, however, did not rely on reasonable foreseeability to conclude that Barron did not meet the requirements of the safety valve. Instead, the district court found that Barron aided and abetted Lara Salas by purchasing the ammunition that was found in the upstairs bedroom. Barron argues that such a conclusion is unsupported by any evidence in the record.

We agree. Even if Barron knew about the presence of the ammunition (which is debatable), there is nothing in the record indicating that Barron himself purchased the ammunition. No testimony regarding who purchased the ammunition was offered. Nor were any receipts proffered as evidence. The district court based its conclusion on Lara Salas's status as an illegal alien, stating that because Lara Salas "wasn't able to buy ammunition himself based on his status," it was "clear to conclude . . . he would direct the defendant to go out and get the ammunition." (Sentencing Hr'g Tr., R. 140, PageID 1095, 1098.) Because the evidence shows that Lara Salas himself purchased the firearm, though, there is no reason to conclude that he could not also purchase the ammunition, even if not legally.

Even if the district court could disregard Lara Salas's statement to the police officers that he purchased the gun, the record is still devoid of any evidence that Barron is the one who purchased the ammunition. *See United States v. Grubbs*, 506 F.3d 434, 440 (6th Cir. 2007) ("[D]isbelief alone cannot constitute affirmative proof[.]"). Because there was no evidence in the record from which it could be reasonably inferred that Barron purchased the ammunition, the district court clearly erred in finding that he aided and abetted Lara Salas. *Goodman v. Simonds*, 61 U.S. 343, 360 (1857) ("Mere speculative inferences are never allowable, and cannot be regarded as evidence."); *United States v. Gibbs*, 182 F.3d 408, 440 (6th Cir. 1999) ("The district court's findings must have "some minimum indicium of reliability beyond mere allegation.") (quoting *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995)).

The government's last effort to dissuade us from finding clear error is unpersuasive. The government argues that even if Barron did not aid and abet Lara Salas's possession, Barron himself constructively possessed the weapon. As an initial matter, the district court did not conclude that Barron constructively possessed the weapon—instead, it relied on a theory of aiding and abetting. In any event, the evidence in the record does not support the conclusion that Barron constructively possessed the weapon.

"Constructive possession exists when a person does not have actual possession but instead *knowingly* has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (emphasis in original) (quoting *United States v. Craven*, 478 F.2d 1329, 1333

(6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977)). "[D]ominion over the premises where the firearm is located" is sufficient to establish the necessary control over the object. *Grubbs*, 506 F.3d at 439 (quoting *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007)). "However, it is without question that '[p]resence alone' near a gun . . . does not 'show the requisite knowledge, power, or intention to exercise control over' the gun to prove constructive possession." *Id.* (quoting *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc)). Nor is "[m]ere presence on the scene plus association with illegal possessors . . . enough" to establish constructive possession. *United States v. Birmley*, 529 F.2d 103, 107 (6th Cir. 1976). Instead, "[o]ther incriminating evidence, coupled with presence is needed to tip the scale in favor of" possession. *Grubbs*, 506 F.3d at 439 (internal quotations and citations omitted).

Here, Barron was found in the home where the firearm was discovered, but that alone is not enough to show constructive possession. "It would be one thing if [Barron] owned the home where the handgun was found, . . . or if he had some contact with the room where it was found[.]" *Id.* at 440 (citing *Craven*, 478 F.2d at 1333–34; *Birmley*, 529 F.2d at 107). But Barron did not own the home and he was not found in the same room as the gun, nor is there any evidence indicating Barron had access to the downstairs bedroom. The only evidence that could possibly tie Barron to the firearm is the ammunition that was found in the room where he was sleeping. And this evidence suffers from the same flaw as the gun—there is no evidence beyond mere proximity to indicate that Barron possessed the ammunition. There is no evidence in the record that shows that Barron even knew the ammunition was in the bedroom, let alone that it was his ammunition. And another individual was found in the room at the time Barron was arrested. "[W]here the defendant is in nonexclusive possession of premises on which illicit contraband is found, it cannot be inferred that he knew of the presence of such contraband and had control of it, unless there are other incriminating statements or circumstances tending to buttress such an inference." *Bailey*, 553 F.3d at 944 n.3 (alterations omitted). No other incriminating statements or circumstances exist tending to show that Barron knew about either the ammunition or the firearm. We therefore conclude that Barron did not constructively possess the firearm and the district court clearly erred in finding that Barron possessed a firearm under U.S.S.G. § 5C1.2(a)(2).

*b.  Providing Truthful Information to the Government*

Turning to the fifth criterion, Barron must show by a preponderance of the evidence that he has truthfully provided the government "all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(a)(5).  This includes information about "the offense of conviction and all relevant conduct," U.S.S.G. § 5C1.2 cmt. n.3, making the safety valve's requirement "greater than the requirement for an acceptance of responsibility reduction under U.S.S.G. § 3E1.1." *Adu*, 82 F.3d at 124.  In order to satisfy the fifth criterion of the safety-valve provision, a defendant may have to do more than "merely answer[] all questions posed by the government." *United States v. O'Dell*, 247 F.3d 655, 675 (6th Cir. 2001).  The provision "clearly require[s] an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses." *Adu*, 82 F.3d at 124.  This includes "complete information regarding the immediate chain of distribution." *United States v. Maduka*, 104 F.3d 891, 894 (6th Cir. 1997).  These "requirements reflect the fact that the safety valve 'was intended to benefit only those defendants who truly cooperate.'" *O'Dell*, 247 F.3d at 675 (quoting *United States v. Martin*, 144 F.3d 1085, 1094 (7th Cir. 1998)).

Even still, a defendant is "only require[d] . . . to provide the information which he possesses, regardless of whether it actually proves helpful to the government." *Maduka*, 104 F.3d at 894–95.  And "[t]ypically, the individuals for whom the safety valve was directed will not have useful testimony to provide because of their relatively low position in the criminal enterprise." *United States v. Carpenter*, 142 F.3d 333, 336 (6th Cir. 1998); *see also United States v. Powers*, 194 F.3d 700, 704 (6th Cir. 1999) (noting that the safety valve was enacted to provide an "escape from mandatory minimum sentences for first-time offenders whose information given to the government does not turn out to amount to 'substantial assistance'").

Once a defendant claims he has satisfied his burden, the government may challenge his entitlement to relief under the safety valve.  The government need not necessarily offer affirmative evidence to show that a defendant is not being truthful and may instead be able to impeach a defendant's argument by pointing out inconsistencies or implausibility.  *See United States v. Collins*, No. 18-2149, 2019 WL 2094033, at *4–5 (7th Cir. May 14, 2019).  But a

district court cannot "determine that the defendant has not rendered a truthful and complete statement based solely on speculation, devoid of any factual support." *Id.* at *5. It is therefore "incumbent upon the Government to rebut [a defendant's case] if it does not want the defendant to prevail"—"if the Government is to prevail in the face of a fact-based submission by the defendant, it must produce a fact-based rebuttal, not rank speculation." *Id.*

"Where the government challenges a defendant's claim of complete and timely disclosure and the defendant does not produce evidence that demonstrates such disclosure, a district court's denial of a motion under § 3553(f) and § 5C1.2[(a)](5) is not clearly erroneous." *United States v. Pena*, 598 F.3d 289, 292 (6th Cir. 2010) (alteration in original) (quoting *Adu*, 82 F.3d at 125). But that "does not mean that once the government challenges a defendant's failure to disclose a certain fact, the defendant must either have proof that he disclosed that fact or lose the safety valve. Rather, his burden is to prove complete and timely disclosure." *United States v. Miller*, 179 F. App'x 944, 948 (6th Cir. 2006) (internal quotation marks omitted).

Barron has met his burden. He provided the government with all relevant information within his knowledge, including: details about his relationship with Lara Salas; details about how he came from Kentucky to California and resided in Lara Salas's home; the approximate length of time he resided in Lara Salas's home and the identity of the person who was residing there with him; that he was paid by Lara Salas to pick up cocaine; the approximate date and location of the drug transaction; a description of the person he picked up the cocaine from, including a description of the vehicle the person was driving; and an admission that he conspired with Lara Salas and others to distribute cocaine.

The government does not dispute that Barron cooperated and provided this information, but argues that Barron omitted other relevant information and misled the government as to some of the information provided. None of the government's arguments are sufficient to rebut Barron's contention that he is entitled to relief under the safety valve. First, the government argues that Barron misled the government by telling law enforcement that he resided with Lara Salas "for approximately a month," even though his bus ticket shows he resided with Lara Salas for a little over six weeks. But any difference in time between "a little over a month" and a

month and three and a half weeks is not material and cannot prevent Barron from obtaining relief under the safety valve.

Next, the government argues that Barron did not satisfy the fifth criterion because he did not provide any explanation of where the $105,375 that officers found on top of the cocaine originated. But the government never offered any evidence that Barron knew where the cash came from. And it is not unreasonable to assume that Barron—whom the government agrees is a low-level offender—would not have this information "because of [his] relatively low position in the criminal enterprise." *Carpenter*, 142 F.3d at 336. Further, there is no evidence in the record demonstrating that the government ever asked Barron about the cash, and the government could not provide us with this information at oral argument. Unlike in cases where we have concluded that the defendant has not met the fifth criterion, there is no evidence—nor does the government even allege—that Barron was evasive or failed to cooperate. *See Adu*, 82 F.3d at 122 (noting that the defendant had "not been completely forthright and had attempted to minimize his own involvement in the conspiracy"); *United States v. Garcia*, 58 F. App'x 69, 71 (6th Cir. 2003) (noting that the government claimed the defendant was "untruthful and evasive" and there were "discrepancies" in his statements); *O'Dell*, 247 F.3d at 675 (noting that defendant "demonstrated a lack of cooperation"). Nor did Barron withhold known, relevant information about his role. *Contra United States v. Henderson*, 307 F. App'x 970, 985–86 (6th Cir. 2009).

To be sure, had Barron "been deceitful or evasive when questioned about [the money], the result would certainly be different." *Miller*, 179 F. App'x at 948. But that was not the case, and thus, mere speculation and assertions by the government, without more, cannot preclude Barron from obtaining relief under the safety valve. *See United States v. Miranda-Santiago*, 96 F.3d 517, 529 (1st Cir. 1996) ("The government cannot assure success simply by saying, 'We don't believe the defendant,' and doing nothing more."); *United States v. Miller*, 179 F.3d 961, 969 (5th Cir. 1999) (rejecting government's assertion that defendant was untruthful as "merely speculative").

Finally, the government argues that Barron provided inaccurate information about Warren's role in the conspiracy by claiming that Warren supplied Barron with drugs, when, according to the government, Warren purchased drugs from the conspiracy. The government

points to the pre-sentence report and an affidavit that supported the search warrant, which contain statements from law enforcement evincing their belief that Lara Salas and Macias Pedroza were supplying Warren with drugs. But these documents also show that Warren was *distributing* drugs to some individuals, both in the past—resulting in a conviction for distribution—and while being surveilled by law enforcement right before the warrants were issued in this case. Thus, Warren may have distributed the six kilograms of cocaine to Barron as he indicated.

No evidence directly conflicts with Barron's contention that he picked up the drugs from Warren, nor has Barron made inconsistent or conflicting statements on the issue. *Contra Maduka*, 104 F.3d at 895 (relying on "[t]he conflict between [defendant's] statements at the time of the drug transactions and his statement at sentencing" to support the conclusion that he was not credible); *United States v. Salgado*, 250 F.3d 438, 460 (6th Cir. 2001) (the "record support[ed] the government's position that [defendant] did not provide a complete statement of his knowledge of the offense" in part because the defendant stated he drove a rental car "despite evidence to the contrary that he drove [a drug supplier's] Mustang"); *United States v. Haynes*, 468 F.3d 422, 427 (6th Cir. 2006) ("Because there was *substantial factual evidence* on the record to support the district court's decision not to grant a safety valve reduction, there was no clear error.") (emphasis added).

In these circumstances, "the record, taken as a whole, will not support a finding that [Barron] has failed to provide a truthful and complete proffer," and "the government's lack of confidence in the proffer is insufficient, in and of itself, to justify a denial of access to the safety valve." *United States v. Marquez*, 280 F.3d 19, 24 (1st Cir. 2002). We reiterate that the purpose of the safety valve "is to reduce some of the harsh inflexibility of mandatory minimum sentences by enabling courts to account more fully for mitigating factors when sentencing those defendants who are considered the least culpable participants in drug trafficking cases." *Garcia*, 58 F. App'x at 71 (citing *Maduka*, 104 F.3d at 893). In other words, the safety valve is a mechanism by which defendants who cooperate are rewarded. The record supports Barron's contention that he cooperated and provided the government all information he had concerning the conspiracy. Because the government has pointed to no evidence that conflicts with Barron's statements, and

Barron has not made any inconsistent or conflicting statements, we conclude that he meets the fifth prong of the safety valve.

### B. Macias Pedroza

Macias Pedroza brings one issue on appeal:  whether the district court erred in failing to distinguish between lay and expert testimony provided by Detective Matthew Evans, who offered fact-witness testimony regarding the investigation and expert-witness testimony identifying a substance as cocaine without a laboratory result.[3]

Evidentiary determinations, including whether a district court failed to differentiate between a witness's fact and expert testimony, are reviewed for an abuse of discretion.  *United States v. Tocco*, 200 F.3d 401, 418–19 (6th Cir. 2000).  "Even if the district court abused its discretion, this does not automatically result in a new trial.  Evidentiary errors remain subject to harmless error review."  *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).  "When a defendant fails to object at trial, we review an evidentiary ruling for plain error."  *Id.*

The government contends that Macias Pedroza's claim is subject to plain-error review because he objected only to the admissibility of Evans's testimony, not to the alleged lack of cautionary instruction regarding Evans's dual testimony.  Even under the more favorable abuse of discretion standard, however, Macias Pedroza's arguments fail.

We have recognized that "when a police officer testifies in two different capacities in the same case, there is a significant risk that the jury will be confused by the officer's dual role."  *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).  Such risks include:  (1) that the agent who testifies as an expert "receives unmerited credibility for lay testimony," (2) that the "witness's dual role . . . confuse[s] the jury," and (3) that "the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the

---

[3]At oral argument, Macias Pedroza argued that the result of the field test was inadmissible because it is inherently unreliable, similar, in his view, to a preliminary breath test or polygraph.  But Macias Pedroza did not make this argument in his opening brief or reply brief and it is therefore waived.  *Amezola-Garcia v. Lynch*, 846 F.3d 135, 139 n.1 (6th Cir. 2016) ("[A]rguments not raised in a party's opening brief are deemed waived.").

defendant not presented at trial." *United States v. Rios*, 830 F.3d 403, 414 (6th Cir. 2016) (internal quotations and citations omitted).

Despite these concerns, we have "refuse[d] to adopt a per se prohibition" on allowing an officer to testify both as a fact and an expert witness. *Thomas*, 74 F.3d at 683; *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014) ("Our circuit does not categorically prohibit an officer from testifying as both a fact witness and an expert witness[.]"). But "both the district court and the prosecutor should take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight to each type of testimony." *United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (quoting *Thomas*, 74 F.3d at 683). We have recognized two primary ways to assure that the jury is properly informed of the dual roles: (1) by providing "an adequate cautionary jury instruction," *Young*, 847 F.3d at 357; or (2) "clear demarcation between expert and fact witness roles," *Lopez-Medina*, 461 F.3d at 744.

Here, adequate jury instructions were provided. The district court properly instructed the jury regarding dual testimony, stating that "several law enforcement officers . . . testified to both facts and opinions" and cautioning the jury to give "[e]ach type of testimony . . . proper weight." (Tr. of Jury Trial Proceedings, R. 182, PageID 1612.) The court proceeded to explain the weight that should be given to each type of testimony, properly told the jurors that they need not accept law enforcement officers' opinions, and stated that the jurors "alone decide how much of a witness's testimony to believe." (*Id.* at PageID 1612–13.) The instructions given by the district court substantially mirror the Sixth Circuit's pattern jury instruction on dual-witnesses. *See* Sixth Circuit Pattern Jury Instruction 7.03A. The district court did not abuse its discretion or plainly err in giving the pattern instruction. *See Tocco*, 200 F.3d at 419 (finding no abuse its discretion when the district court instructed the jury that it should consider an officer's dual roles).

## III.  CONCLUSION

For these reasons, we affirm Macias Pedroza's conviction but vacate Barron's sentence and remand his case for resentencing with instructions to apply the provisions of the safety valve and sentence Barron without regard to the ten-year mandatory minimum sentence.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur in all respects with the majority opinion, except for the discussion of Barron's eligibility for the safety valve. Thus, I would affirm the district court's decision in full. As the majority correctly discusses the eligibility for the safety valve, Barron had to prove that he met all five of the criteria under section 5C1.2 of the Guidelines. *See United States v. Bazel*, 80 F.3d 1140, 1141 (6th Cir. 1996). Further, the defendant has the burden of proving by a preponderance of the evidence that he is entitled to relief under all of those criteria. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004). The two criteria in question are that (2) Barron did not possess a firearm or other dangerous weapon in connection with the offense and (5) Barron was cooperative with the Government concerning the offenses. Part (5) will not be discussed, although there is some question as to whether Barron cooperated with the Government concerning his knowledge of the drug operation.

The district court found that Barron aided and abetted Salas by purchasing the ammunition. As the majority indicates, there is no evidence to support that conclusion. However, Barron aided and abetted Salas by keeping the majority of the ammunition in his bedroom. True, Salas had the firearm in his room, but Barron had all of the ammunition, except what was in the pistol, in his own bedroom. In addition to the ammunition in his bedroom, the cocaine was under Barron's bed. Although the bedroom was cluttered with clothes and other items, the partial box of ammunition in the bedroom was no more piled up than the cocaine under the bed. As Barron had the burden of proving that he did not know about the ammunition, I would find that he did not meet criteria (2) because his possession of the partial box of ammunition assisted Salas, who was in the house with the weapon that would use the ammunition if necessary. Had the burden been upon the Government rather than Barron, the answer might be different. Likewise, if the Government had the burden of proving beyond a reasonable doubt that Barron possessed a firearm in connection with the offense, the safety valve might be applicable. Therefore, I would affirm the district court in full.