NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0035n.06

No. 19-6229

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES |
| | ) | DISTRICT COURT FOR THE WESTERN |
| OLUFOLAJIMI ABEGUNDE, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | OPINION |

**FILED**
Jan 14, 2021
DEBORAH S. HUNT, Clerk

---

**BEFORE:**   **WHITE, STRANCH, and MURPHY, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.**   Olufolajimi Abegunde appeals his conviction and sentence for witness tampering and for conspiracy to commit wire and bank fraud, money laundering, and marriage fraud. In this direct appeal, Abegunde contends that: (1) the district court erred in denying his motion to sever the conspiracy to commit marriage fraud count from the other counts pursuant to Federal Rules of Criminal Procedure 8 and 14; (2) the evidence was insufficient to support the jury's verdict of guilty as to the convictions for conspiracy to commit wire fraud and conspiracy to commit money laundering; (3) the venue was improper; (4) the district court abused its discretion by not providing a jury instruction and demarcation between witnesses' dual roles as fact and expert witnesses; and (5) the district court erred in using a "loss chart" to determine the economic loss for the proper sentencing range for Abegunde. For the reasons discussed below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Facts

This case grows out of business email compromise schemes (BEC). The schemes involved hacking into a company's email servers and creating fake emails directing the company's employees to wire funds into bank accounts controlled by the perpetrators. Typically, after a sum is wired from a BEC, the money is transferred to multiple other bank accounts before reaching its final destination. This "network" of bank accounts exchanges smaller portions of the initial transfer amount in an attempt to clean the money and to avoid detection by banks and law enforcement.[1] Members of the network often do not know one another; they "simply fill a role for some sort of payment along the way." Banks will sometimes contact account owners that are suspected participants in these networks to alert them to fraud on their account. If the account owner lies about the source of the funds, law enforcement considers the statements as evidence that the owner may be a knowing participant.

One of the businesses targeted in a BEC scheme in this case was Crye-Leike, a real estate company in the Western District of Tennessee. A hacker directed a real estate agent to wire $154,000 to a bank account controlled by the perpetrators. The FBI traced the fraudulent Crye-Leike transfer to Javier Luis Ramos-Alonso, Abegunde's co-defendant. Law enforcement then subpoenaed additional bank records associated with Ramos-Alonso and found other suspicious transactions, including suspected BECs involving other businesses. A scheme involving another business, Whatcom, followed a similar pattern. Company emails were compromised, and a fake email instructed an employee to wire funds to an account in the hackers' control. Believing the

---

[1] Transactions to the network bank accounts are smaller because banks are required by law to report transactions of more than $10,000.

email was authentic, a Whatcom employee wired more than $60,000 to an account controlled by Ramos-Alonso.

Ramos-Alonso's bank records also indicate that he attempted to divide the large amount of money received from the BECs into smaller transfers into other accounts. Wells Fargo flagged Ramos-Alonso's bank account for suspicious activity and a bank investigator contacted him about the large wires and repeated smaller transactions. The investigator also reviewed bank accounts that received wires from Ramos-Alonso. Some of the money was wired to bank accounts with Abegunde's address, and one account also listed Abegunde's phone number. When the investigator called the phone number, Abegunde answered and stated that he had received the money from a friend in Nigeria. Suspecting fraud, Wells Fargo recalled the funds from the account.

Although Abegunde's name was not on the bank accounts, at trial the Government offered evidence that Abegunde was in control of the accounts because they were attached to his address and phone number; Abegunde directed individuals to transfer money into the account; and the individuals whose names were on the account were not in the United States when some of the transactions were processed.

The Government sought to prove that Abegunde used these accounts, as well as nearly 40 other third-party accounts, because many of his personal accounts were closed. These accounts were "used or given out by Mr. Abegunde for other people to put money into [and] were not his own." In Abegunde's own words, he had to "beg, incentivize, [and] lobby people to give [him] their account," to continue his participation in the scheme. Most of this coordination occurred over an encrypted messaging application, WhatsApp.

The Government also provided testimony that Abegunde coordinated currency exchanges, for people seeking exchanges from Nigerian naira to United States dollars, to clean money received from the BEC schemes. Ramos wired $9,000 tied to a BEC scheme to a bank account alleged to be under Abegunde's control. As to the Whatcom BEC, Abegunde provided the account information for one of the accounts he allegedly controlled when a conspirator requested a bank account "fast."

Evidence regarding the bank accounts receiving fraudulent funds showed that some were attached to Abegunde's phone number and address. At least one such account bore the name of an alleged co-conspirator, Ayodeji Ojo. The FBI contacted Abegunde at his home to inquire about suspected fraud. When asked about an "illegal money transfer" on the account, Abegunde condemned people that committed fraud, but claimed that people using or transferring proceeds from a fraudulent scheme were not involved in criminal activity. Even after the officer warned Abegunde about potential liability for receiving and transferring fraudulent proceeds, Abegunde "emphatically disagreed." Abegunde also misrepresented his knowledge of Ojo's involvement in the scheme, but later messaged Ojo and laughed about this concealment. In one communication, Abegunde expressed his fear about allowing "money to be paid into an account that can be tracked" and asked about mitigating the risk of conspiracy to commit fraud. In another exchange, Abegunde said that he really does not know the others involvedor the source for the funds, but they "pay into accounts," and he admitted that his exchanges "clean the cash and eliminate the risk."

Regarding the marriage fraud count, the evidence showed that Abegunde married Edchae Caffey, a member of the United States Army, in 2016. Caffey testified that Abegunde paid her to enter into the marriage so that he could "get a green card." During trial the Government also

4

provided proof that Abegunde entered the marriage to receive Caffey's military benefits and that Abegunde opened joint accounts with Caffey to transfer fraudulent funds.

### B.      Procedural History

A grand jury charged Abegunde and several others in a multi-count indictment involving cybercrimes and fraud. Abegunde's case was ultimately severed from all other defendants, except Javier Luis Ramos-Alonso. The grand jury returned a superseding indictment charging Abegunde and Ramos-Alonso with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, and conspiracy to launder money by conducting a financial transaction involving property that represented the proceeds of a specified unlawful activity, in violation of 18 U.S.C. § 1956(h). Ramos-Alonso was also charged with wire fraud, in violation of 18 U.S.C. § 1343. Abegunde was further charged with conspiracy to enter into a marriage for the purpose of evading immigration laws, in violation of 18 U.S.C. § 371, and witness tampering, in violation of 18 U.S.C. § 1512(b). The district court denied Abegunde's motion to sever the marriage-fraud conspiracy count.

The Government presented two law enforcement officers, Marcus Vance and David Palmer, who each testified twice at trial providing evidence as both expert and fact witnesses. Prior to sending the case to the jury, the district court gave the jury an instruction on how to consider the testimony of Agents Vance and Palmer.

After a seven day trial, a jury convicted Abegunde of wire-fraud conspiracy, in violation of 18 U.S.C. § 1349; money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h); conspiracy to enter a marriage for the purpose of evading immigration laws, in violation of 18 U.S.C. § 371; and witness tampering, in violation of 18 U.S.C. § 1512(b). After a three-day sentencing hearing, the district court sentenced Abegunde to 78 months of imprisonment.

## II.    DISCUSSION

Abegunde challenges:  (1) the district court's denial of his motion to sever the marriage fraud count from the other counts; (2) the sufficiency of the evidence for his wire fraud conspiracy and money laundering conspiracy convictions; (3) venue; (4) the district court's lack of demarcation between witnesses' dual roles as fact and  expert witnesses; and (5) the district court's use of a "loss chart" during sentencing. We will address each separately.

### A.    **Improper Joinder**

Abegunde contends that the district court's failure to sever his marriage fraud count from the other counts resulted in prejudice that prevented the jury from making a reliable judgment about his guilt or innocence.  "Misjoinder is a question of law that we review de novo."  *United States v. Deitz*, 577 F.3d 672, 692 (6th Cir. 2009).  Even where joinder is proper, a defendant may move to sever offenses on the basis that he will be prejudiced by a joinder of the offenses.  *United States v. Hang Le-Thy Tran*, 433 F.3d 472, 478 (6th Cir. 2006).  We review denial of a severance motion based on a claim of prejudice for abuse of discretion.  *United States v. Jacobs*, 244 F.3d 503, 506 (6th Cir. 2001).

Joint trials for defendants listed in the same indictment are preferred to "conserve . . . funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968)).  Indeed, joinder ensures that an alleged criminal act need only be proven once.  *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987).

#### 1.    Joinder Under Rule 8(b)

Federal Rule of Criminal Procedure 8 governs the conditions under which multiple offenses and defendants may be joined in a single indictment.  Because this Rule is designed to

promote judicial economy and avoid "multiplicity of trials" and the "scandal and inequity of inconsistent verdicts," *Zafiro v. United States*, 506 U.S. 534, 537, 540 (1993) (quoting *Bruton*, 391 U.S. at 131 n.6, and *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)), a district court should construe Rule 8 in favor of initial joinder, *United States v. Moreno*, 933 F.2d 362, 370 (6th Cir. 1991). Rule 8(a) governs the joinder of multiple offenses and Rule 8(b) governs the joinder of multiple defendants. Although we have left the issue open, many courts have held that Rule 8(b) (rather than Rule 8(a)) governs a defendant's claim that multiple offenses were improperly joined in a multi-defendant case. *See United States v. Frost*, 125 F.3d 346, 389 (6th Cir. 1997); *United States v. Johnson*, 763 F.2d 773, 776 (6th Cir. 1985). As in *Frost*, we need not conclusively decide the rule that applies in this setting because Abegunde's claim fails even under Rule 8(b)'s stricter joinder rules. Rule 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Under Rule 8(b), multiple defendants are properly joined only where each count arises out of the "same act or transaction" or "same series of acts or transactions." *United States v. Hatcher,* 680 F.2d 438, 441 (6th Cir. 1982). Acts or transactions constitute a series "if they are logically interrelated" or "part of a common scheme or plan." *Johnson*, 763 F.2d at 776. We have also determined that joinder is proper where there is "overlapping proof." *Swift*, 809 F.2d at 322.

Even if all counts have a common defendant, the indictment on its face must allege a connection between a co-defendant and the additional count charged to the other defendant. *Hatcher,* 680 F.2d at 441. However, not all defendants need to be charged with the same counts. In *Johnson*, Johnson and four other co-defendants were charged in a conspiracy to produce

fraudulent car titles and sell stolen vehicles. *Johnson*, 763 F.2d at 773–75. In addition to the conspiracy related to the car titles, Johnson and her husband were also charged with mail fraud for sending a false insurance claim based on a fraudulent title. *Id.* at 775. Even though the two other co-defendants were not charged with mail fraud, we concluded that joinder was not improper under Rule 8(b) because Johnson perpetrated the mail fraud through the overarching conspiracy. *Id.* at 776 (stating that "the mail fraud was logically interrelated with the other acts charged in the indictment").

The district court denied Abegunde's motion to sever the marriage fraud count. In the indictment, the Government made several allegations supporting the logical interrelatedness of the conspiracy counts (to commit wire fraud, bank fraud, and money laundering) to the conspiracy to commit marriage fraud. The indictment alleged that Abegunde would pay Caffey to marry him and help him obtain immigration status, and "Abegunde would use the access provided by his fraudulently obtained immigration status to open multiple financial accounts" used to facilitate the conspiracy. Immediately after Abegunde and Caffey were married, they opened two joint Bank of America accounts and Caffey added Abegunde as a co-signor to a USAA account. Days later, there were a series of incoming and outgoing transfers in one Bank of America account in amounts just under $10,000, the threshold for triggering reporting obligations under anti-money laundering laws. Approximately two months after opening, the Bank of America accounts were closed by the bank due to suspicion of fraudulent activity. Moreover, Caffey had expressed her discomfort with being "linked to" those transfers.

As alleged in the indictment, it is reasonable to infer that Abegunde used his marriage to Caffey to facilitate the transfer and receipt of funds obtained through the alleged conspiracies, in which Ramos-Alonso was participant. The evidence of Abegunde's transfers in his joint accounts

8

with Caffey serve as "overlapping proof" of conspiracy to commit bank fraud and his conspiracy to commit marriage fraud. Evidence that Abegunde used the joint bank accounts from the marriage to transfer money obtained from the BEC schemes, moreover, was also proof of the fraud charges because it demonstrated how Abegunde laundered the money at issue. The district court did not err in denying the motion to sever under Rule 8.

2. Severance Under Rule 14

Abegunde also argues that even if joinder was proper under Rule 8, the court should have granted severance under Rule 14. Where joinder is proper under Rule 8(b), under Rule 14(b), a "strong showing of prejudice" may justify severance. *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985). Severance is within the court's discretion and is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Ross*, 703 F.3d 856, 884 (6th Cir. 2012) (quoting *Zafiro*, 506 U.S. at 539). To show the court abused its discretion, Abegunde must demonstrate "compelling, specific, and actual prejudice." *Thomas v. United States*, 849 F.3d 669, 675 (6th Cir. 2017); *see also United States v. Martinez*, 432 F. App'x 526, 529 (6th Cir. 2011) (noting that a risk of "simple prejudice" is insufficient to warrant separate trials of co-defendants).

Even if a defendant demonstrates prejudice, courts must balance that with "the interest of the public in avoiding a multiplicity of litigation." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005) (quoting *United States v. Wirsing,* 719 F.2d 859, 864–65 (6th Cir. 1983)). Indeed, even when risk of prejudice is high, it may be cured by "less drastic measures, such as limiting instructions." *Ross*, 703 F.3d at 884. "[I]f a jury can properly compartmentalize the evidence as

9

it relates to the appropriate defendants," a motion for severance should be denied. *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987).

At trial, the Government presented evidence to demonstrate that Abegunde used his allegedly fraudulent marriage with Caffey to open joint bank accounts and conduct transactions related to the overarching conspiracies. Abegunde contends that the marriage fraud count should have been severed because the "intricate nature of the offenses and the voluminous amounts of evidence to be presented" may cause jury confusion. But the complexity of the evidence alone does not guarantee severance; rather, Abegunde must explain how and why this evidence would "mislead and confuse the jury in the absence of a separate trial." *United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014) (quoting *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002)). In this case, the Government presented evidence that indicates a direct and overlapping connection between the allegations of marriage fraud and the conspiracies to commit fraud and money laundering. Government witnesses provided testimony that Abegunde relied on financial resources obtained from the fraudulent marriage to further the wire fraud and money laundering conspiracies. Moreover, the court instructed the jury to consider evidence on each count separately and "decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge." *See United States v. Cody*, 498 F.3d 582, 588 (6th Cir. 2007) (recognizing that a limiting instruction can overcome the prejudicial effect of improper joinder). Abegunde has not demonstrated compelling, specific, and actual prejudice. Given Abegunde's failure to offer compelling examples of how the Government's evidence may have misled the jury and the district court's limiting instruction, the court did not abuse its discretion in denying the motion for severance under Rule 14.

### B.    Sufficiency of Evidence

Abegunde challenges the sufficiency of the evidence supporting his convictions of wire-fraud conspiracy, in violation of 18 U.S.C. § 1349, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  We review a district court's denial of a motion for judgment of acquittal de novo.  *United States v. Ramirez*, 635 F.3d 249, 255 (6th Cir. 2011).  "When considering a challenge to the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Osborne*, 886 F.3d 604, 608 (6th Cir. 2018) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The Court may not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Id.* (quoting *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010)).

Wire fraud requires proof of three elements.  The Government must prove that the defendant:  (1) "devised or willfully participated in a scheme to defraud"; (2) "used or caused to be used an interstate wire communication 'in furtherance of the scheme'"; and (3) "intended 'to deprive a victim of money or property.'"  *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (quoting *United States v. Prince*, 214 F.3d 740, 748 (6th Cir.2000)).  To support a conspiracy to commit wire fraud, the evidence must show that "the defendant 'knowingly and willfully joined in an agreement with at least one other person to commit an act of [wire] fraud and that there was at least one overt act in furtherance of the agreement.'"  *United States v. Cunningham*, 679 F.3d 355, 373 (6th Cir. 2012) (quoting *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005)).

11

Similarly, for the money laundering conspiracy the Government had to prove that two or more persons conspired or agreed to commit the crime of money laundering; and that the defendant knowingly and voluntarily joined the conspiracy. *See United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (noting that the Government only had to prove that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment"). A money laundering conspiracy does not require proof of an overt act. *Id.*

Here, the Government presented evidence that some of the proceeds from the overarching fraudulent schemes were received by Abegunde. Agent Vance testified that in similar conspiracy cases, it is typical for conspirators to "chop" large sums of money and distribute it through a chain to conceal or disguise the nature, source, or control of the money. *See United States v. Agundiz-Montes*, 679 F. App'x 380, 387 (6th Cir. 2017). A Wells Fargo financial crimes consultant, Brian Ancona, testified that proceeds received from fraudulent schemes were sent to Ramos-Alonso, Abegunde's co-defendant, who then distributed the money into accounts opened by Abegunde or under his control. The criminal agreement from these chain transfers of proceeds "can be inferred from the interdependence of the enterprise." *See United States v. Warman*, 578 F.3d 320, 333 (6th Cir. 2009).

The Government also provided evidence that Abegunde had knowledge of and agreed to participate in the conspiracy. On the date of one of the BECs, Abegunde directed an individual to transfer money into an account linked to his phone number and address. In a conversation with a colleague over WhatsApp, Abegunde admitted that he does not know the men coordinating the scheme, but said that they put money into his accounts, and his exchanges "clean the cash and eliminate the risk." And when the FBI questioned him about his knowledge regarding fraud

12

occurring on the account, Abegunde's WhatsApp messages indicate that he lied about his involvement and then contacted a co-conspirator to joke about his concealment.

This evidence also supports the money-laundering conspiracy. Abegunde coordinated several transfers of fraudulent proceeds to accounts under his control or the control of his co-conspirators indicating it would clean the money. Abegunde also lied to the FBI and later spoke to his friend about taking advantage of an opportunity. A reasonable trier of fact could find that Abegunde knowingly participated in the distribution cleaning of the proceeds to seek his own financial benefit and that he lied to law enforcement and used a messaging application to conceal his participation in the scheme.

Abegunde does not challenge the existence of the overarching fraudulent schemes, claiming only that "the government failed to present direct evidence of an agreement or consent on the part of Mr. Abegunde to commit the crime of wire fraud or money laundering." Abegunde argues that he did not know every member of the conspiracy, nor did he undertake all of the conspiracy's activities. In discussing the knowledge requirement in a drug conspiracy, however, we have determined that "it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise." *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) (quoting *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993)); *see also Warman*, 578 F.3d at 332 ("[P]roof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice." (quoting *United States v. Martinez*, 430 F.3d 317, 330-31 (6th Cir. 2005))); *Martinez*, 430 F.3d at 333 (noting that a defendant need not "be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement" (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)))). Given Abegunde's conduct in directing fraudulent proceeds, communications indicating he was aware

that the proceeds might not be legitimate, and his attempts to conceal the nature of his relationship with Ojo, a reasonable factfinder could find Abegunde guilty of wire fraud conspiracy and money laundering conspiracy. The district court did not err in denying the motion for judgment of acquittal.

### C. Venue

Abegunde argues that his prosecution for wire fraud in the Western District of Tennessee was improper because there was not a direct link to the jurisdiction. Because Abegunde did not raise this venue objection in the district court, we review his objection to venue for plain error. *United States v. Parlier*, 570 F. App'x 509, 512 (6th Cir. 2014). To prevail under plain error, Abegunde must show "an error that is clear or obvious, affecting [his] substantial rights, and seriously affecting the fairness, integrity or public reputation of judicial proceedings." *United States v. Lopez-Medina*, 461 F.3d 724, 746 (6th Cir. 2006).

The Constitution and the Federal Rules of Criminal Procedure require that a crime be prosecuted and tried in the district where the crime was committed. *See* U.S. Const. art. III § 2; U.S. Const. amend. VI; Fed. R. Crim. P. 18. As a continuing offense, wire fraud is subject to the provisions of 18 U.S.C. § 3237 and thus can be "prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see United States v. Grenoble*, 413 F.3d 569, 573 (6th Cir. 2005) (stating that under 18 U.S.C. § 3237, wire fraud is a continuing offense). Conspiracy to commit wire fraud is also a continuing offense and may be prosecuted "in any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." *United States v. Scaife*, 749 F.2d 338, 346 (6th Cir. 1984). "A conspiracy defendant need not have entered the district so long as this standard is met." *Id.*

14

Abegunde does not dispute that the Government's evidence linked him to an account that received $9,000 of $154,000 in fraudulent funds from a company in the Western District of Tennessee. Abegunde's counsel acknowledged that those proceeds related to the Western District of Tennessee. The trial record shows that overt acts committed in furtherance of the conspiracy were performed in this district. Venue was proper.

### D. Jury Instructions

Abegunde contends that the district court abused its discretion by failing to provide a cautionary jury instruction regarding the dual witness roles of Agents Vance and Palmer. "Evidentiary determinations, including whether a district court failed to differentiate between a witness's fact and expert testimony, are reviewed for an abuse of discretion." *United States v. Barron*, 940 F.3d 903, 920 (6th Cir. 2019). Even when a court abuses its discretion, however, evidentiary errors are subject to harmless error review. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). An error is not to be deemed harmless if it affects substantial rights or affects the outcome of the court's proceedings. *United States v. Inman*, 666 F.3d 1001, 1006 (6th Cir. 2012) (per curiam).

When a law enforcement officer testifies as both a lay witness and an expert witness, there is risk that: (1) the expert will later "receive[] 'unmerited credibility' for lay testimony," (2) the "witness's dual role . . . confuse[s] the jury," and (3) "the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial." *United States v. Rio*s, 830 F.3d 403, 414 (6th Cir. 2016) (quoting *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007) and *United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009)). "[T]he district court and the prosecutor should take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and

an expert witness, so that the jury can give proper weight to each type of testimony." *Lopez-Medina*, 461 F.3d at 743 (quoting *United States v. Thomas*, 74 F.3d 676, 683 (6th Cir. 1996)).

In *United States v. Barron*, a criminal defendant challenged the dual role of testimony provided by a law enforcement officer. 940 F.3d at 920. Prior to submitting the case to the jury, the court gave an instruction distinguishing the dual roles of the law enforcement officer's testimony and the proper weight to give to each testimony. *Id.* at 920–21. The instructions mirrored the Sixth Circuit's pattern jury instruction on dual witnesses. *See* Sixth Circuit Pattern Jury Instruction 7.03A. On facts substantially similar to this case, we found the jury instructions were adequate and that the district court did not abuse its discretion or plainly err in giving the pattern instruction. *Id.* at 921.

During trial, the Government presented FBI Agents Marcus Vance and David Palmer as both expert and lay fact witnesses. Vance's testimony as an expert began on the second day of trial, and two days later, he testified as a fact witness. Similarly, Palmer testified as an expert on the third day of trial, and testified as a fact witness two days later. At the close of Vance's expert testimony, the Government asked the district court to explain the change in the nature of his testimony before he returned as a fact witness. The court declined to communicate a specific demarcation, stating that an instruction during trial would not "mean[] that much to the jury" and that "it is hard to draw the line." At the close of evidence, however, the court explained that Agents Vance and Palmer testified as both expert and fact witnesses and instructed the jury on the proper weight to give to each form of testimony:

> As to the testimony on facts, consider the factors discussed earlier in these instructions for weighing the credibility of witnesses. As to the testimony on opinions, you do not have to accept Special Agents Vance and Palmer's opinions. In deciding how much weight to give it, you should consider the witnesses' qualifications and how they reached their conclusions, along with the other factors discussed in these instructions for weighing the credibility of witnesses.

16

(R.252, Jury Instructions, Page ID 996) This instruction is consistent with the Sixth Circuit Pattern Jury Instruction 7.03A. The court further reminded the jury that they "alone decide how much of a witness's testimony to believe, and how much weight it deserves." Moreover, the opinion and fact testimonies were provided on different days. *See United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (noting that dual roles of a witness can be properly demarcated when testimony occurs at different times during trial in conjunction with limiting instructions).

Abegunde points to *United States v. Lopez-Medina* to contend that since there was not a clear demarcation during the testimony, he is entitled to relief. Though a district court can cure potential challenges to jury confusion by providing a "clear demarcation between expert and fact witness roles," *Lopez-Medina*, 461 F.3d at 744, this harm may also be cured by providing "an adequate cautionary jury instruction," *United States v. Young*, 847 F.3d 328, 357 (6th Cir. 2017). That is what happened here. There was no abuse of discretion here because the court temporally separated opinion and fact testimony and provided a clear instruction before jury deliberations explaining the roles of each dual witness and the proper weight to assign to each.

### E. Loss Chart

Finally, Abegunde argues that the district court erred in using the loss chart to determine his sentencing range because there were no allegations made that established that the transactions were in any way illegal. We review whether actions or events are "relevant conduct" under § 1B1.3(a)(1)(A) de novo; factual findings underlying the district court's determination that conduct is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity are reviewed for clear error. *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002). At sentencing, the district court may consider any relevant evidence as long as it is supported by sufficient indicia of reliability. USSG § 6A1.3(a).

Sentencing Guideline § 2B1.1(b)(1), the loss provision, directs a court to increase an offense level based on the amount of economic "loss" that resulted from the defendant's conduct. "In calculating the Guidelines loss under U.S.S.G. § 2B1.1(b)(1), district courts include losses sustained from relevant conduct under U.S.S.G. § 1B1.3." *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013). This "relevant conduct" may be considered if it is "part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir.1996) (quoting USSG § 1B1.3(a)(2)). "To qualify as part of a 'common scheme or plan' under the 'relevant conduct' guideline, the offenses 'must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.'" *Id.* (quoting USSG § 1B1.3, cmt. n.9(A) (1995)). The district court "need only make a reasonable estimate of the loss . . . based on available information," and its "loss determination is entitled to appropriate deference." USSG § 2B1.1 cmt. n.3(C).

Relevant conduct includes all criminal conduct committed, aided, abetted, counselled, commanded, induced, procured or willfully caused by Abegunde. USSG § 1B1.3(a)(1)(A). Conduct of others is only relevant when it is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity. USSG § 1B1.3 cmt. n.3(A). District courts must make "particularized findings with respect to both the scope of the defendant's agreement and the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphases omitted).

Abegunde's initial Presentence Report determined that the loss caused was $793,447.69. The calculation was based, in part, on a loss chart that included 81 transactions involving

18

Abegunde and his alleged co-conspirators. The chart included the date of the transaction, the bank and account information of the transaction, the third-party name on the account, and the amount that was transferred. Most of the transactions were under $10,000. On the second day of the sentencing hearing, the district court allowed both parties to present their arguments concerning the loss chart. Based on the evidence demonstrating the same modus operandi, the district court concluded that Abegunde was a "downstream middleman money launderer" where his role was to help "clean the funds" obtained by the overarching BECs. The court calculated the loss amount associated with Abegunde's offense conduct at $596,926.11 and ultimately determined that the loss chart could be used to determine economic loss and the appropriate sentencing range for Abegunde.

On appeal, Abegunde argues that the Government failed to provide evidence that the transactions were illegal or that he knew or should have known that the transactions were from funds illegally obtained. The Government's witness admittedly could not pinpoint the original source of the funds, other than one $9,000 transfer that occurred in October 2016. The Government argues that Abegunde conducted currency exchanges with a fee to third-parties to clean the money received through the illegal conspiracy. It notes that the record contains evidence that each transaction was directly linked to a communication in Abegunde's phone where he solicited a third party to use their account to transfer funds. Each transaction had a similar pattern: someone would approach Abegunde saying he had a certain amount of money and wanted to do a deal, the two would work out an exchange rate, and Abegunde would provide a third-party account to conduct the transaction. Of the 81 transactions, there were 10-12 "repeat customers." Abegunde's written communications expressed frustration with his personal accounts being closed and his interest in conducting transactions that could not be tracked.

The district court did not err in determining that Abegunde's conduct was "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity. Abegunde's participation in the conspiracy, even if limited, was a necessary component for cleaning money obtained fraudulently and a part of a chain commonly seen in fraud and money laundering schemes. Given the repeated nature and pattern of the transactions, the known relations of some of the parties in the transactions, and the communications tying Abegunde directly to each transaction, the district court appropriately found by a preponderance of the evidence that the third-party transactions were commanded by Abegunde and were "relevant conduct" for the purposes of sentencing. *United States v. Donadeo*, 910 F.3d 886, 901 (6th Cir. 2018) ("the government must prove the amount of loss attributable to a defendant . . . by a preponderance of the evidence").

## III.    CONCLUSION

For the reasons explained above, we AFFIRM Abegunde's convictions and sentence.