NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0212n.06

Case Nos. 23-3931/3932

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RAMEL DREW,

    Defendant-Appellant.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**FILED**<br>Apr 18, 2025<br>KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

</td></tr>
</table>

Before: STRANCH, THAPAR, and DAVIS, Circuit Judges.

PER CURIAM. A jury found Ramel Drew guilty of various drug-related offenses arising from his participation in an East Cleveland fentanyl distribution scheme. Drew brings a host of challenges to the failed plea negotiation process, the operation of his trial, his conviction, and his prison sentence. Because all his arguments come up short, we affirm.

I.

Through wiretaps, controlled purchases, confidential informants, and witness interviews, federal and state law enforcement agents uncovered a large-scale fentanyl distribution scheme in Cleveland, Ohio. The ring leaders were Devonn Fair and Brandon Bryant. Fair, Bryant, and others distributed fentanyl from a drug house on East 89th Street and a drug house on East 109th Street.

Federal agents' investigation also led them to Ramel Drew. On a wiretap, for example, they heard Drew advising Bryant about a GPS tracker that Bryant believed police had installed on

his car. They also heard Drew discussing drug transportation and drug supplies with Bryant. Confidential sources also informed investigators that they had purchased heroin and fentanyl from Drew. In addition, the agents orchestrated a controlled purchase, in which Drew sold a confidential source $200 worth of fentanyl on East 109th Street.

At first, there was only enough evidence to tie Drew to (1) the East 109th Street house (not the East 89th Street house), (2) the controlled purchase of fentanyl from Drew, and (3) Drew's phone calls with Bryant discussing drugs. So, the government first indicted Drew on three counts: (1) conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846, (2) distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and (3) use of a communication facility in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 843(b).

The government's proposed plea agreement for Drew was placed on the record on August 2, 2022. That same day, the district court held a pretrial hearing designed to "make sure" that Drew and the other defendants were "aware of the government's offer." R. 858, Pg. ID 8798. That way, explained the district judge, if a defendant didn't accept the offer, was convicted at trial, and was sentenced for longer than the terms of the plea offer, there would be no "issues going forward." *Id.* The district judge repeatedly stressed that he was "required to make sure [the defendants were] aware of the government's offer." *Id.* at Pg. ID 8799. Drew's lawyer confirmed that Drew had "received" and "considered" the proposed plea agreement. *Id.* at Pg. ID 8803. The attorney then added that Drew "would like to reconsider" the plea agreement, to which the district judge responded that he "better do it very quickly." *Id.* Later in the hearing, the judge reiterated that he did not "have a problem" with Drew going to trial, but that today was "the cutoff" for accepting the plea. *Id.* at Pg. ID 8811.

A few months later, Drew's defense counsel moved to withdraw from representing Drew, citing irreconcilable differences. At a status conference on December 21, 2022, the court granted counsel's motion. At that same conference, the court stressed that this was the "final cutoff date . . . for any plea in the case." R. 1044, Pg. ID 10212. Then, after a description of the plea deal's terms that Drew had previously rejected, the district judge expressly asked Drew whether he understood them, and if so, whether he rejected the plea.

After an extended back and forth, Drew contended that he had already accepted the plea on August 2. The district judge responded: "You clearly did not or I would have had that plea and I would have accepted that plea." *Id.* at Pg. ID 10222.

Another back and forth ensued. Then, the district judge said to Drew: "You heard the government's plea offer. Do you wish to accept that offer or not?" *Id.* at Pg. ID 10223. Drew responded that he didn't understand the offer. *Id.* At that point, the district judge asked Drew's counsel to explain the plea to Drew. But counsel then told the court that he had given the plea agreement to Drew weeks before and Drew "abruptly rejected" it. *Id.* The district judge concluded that he had "heard enough from the defendant here today to . . . know that he doesn't want to enter a plea." *Id.* at Pg. ID 10224.

Meanwhile, in the months following Drew's initial indictment, investigators uncovered more evidence of Drew's involvement in the drug conspiracy—and this time, the evidence tied Drew to the East 89th Street drug house. For example, a surveillance video showed Drew accessing the house with a key and selling drugs in the house's driveway. A search of the East 89th Street home also revealed firearms and large amounts of fentanyl (far more than alleged in the initial indictment).

Based on the new evidence at East 89th Street, the government filed a separate, new indictment against Drew in January 2023. The new indictment charged him with possessing with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Both indictments were then consolidated for a single trial.

Drew's new counsel was appointed just as the new indictment came down in January 2023. Before trial, Drew's new counsel moved to continue the trial. In support of the motion, counsel pointed to the extensive discovery material and surveillance footage, as well as insufficient time to prepare for trial and perform legal research. The government opposed the motion. It argued the case wasn't especially complex and that the burden of reviewing the surveillance footage would be reduced by the government supplying the agents' accompanying notes. The district court denied Drew's motion. The court reasoned that the evidence was "straightforward" and that the government would "pare . . . down" the video evidence to reduce the burden on Drew's new counsel. R. 1012, Pg. ID 9789.

Drew proceeded to trial. A jury found Drew guilty on all the counts—except the felon in possession charge. The jury was hung on that count.

At sentencing, Drew filed various objections to his presentence report. But the district court overruled them, leaving Drew with an advisory Guidelines range of 235 to 293 months. The district court then varied upward from a criminal history Category V to a Category VI based on Drew's "routine recidivism in criminal behavior" and record of parole violations, leaving him with a range of 262 to 327 months. R. 1013, Pg. ID 9856–57. The court sentenced him to 327 months of imprisonment and ten years of supervised release.

On appeal, Drew challenges several aspects of the plea process, his trial, his conviction, and his sentence. We address each in turn, starting with his pre-trial arguments and moving chronologically to his sentencing challenges.

II.

A.

Drew first argues that the district court erred by not conducting a sufficient inquiry on the record as to whether he was accepting or rejecting the August 2 plea agreement. Drew didn't make this argument below, so we review for plain error. Fed. R. Crim. P. 52(b). Since there was no obligation for the district court to make such an inquiry, there was no error here, plain or otherwise.

It is counsel, not the court, who bears the responsibility for ensuring that a defendant's desire to plead guilty is communicated. *Missouri v. Frye*, 566 U.S. 134, 142–43 (2012). Indeed, the rules forbid district courts from engaging in plea negotiations. Fed. R. Crim. P. 11(c)(1). Thus, defendants can reject plea offers or let them lapse without a district court ever knowing or inquiring about it. *Frye*, 566 U.S. at 143.

Drew, however, argues that *Missouri v. Frye* requires a district court to make a special inquiry. 566 U.S. 134. He is incorrect. *Frye* was a Sixth Amendment case that held defense counsel must "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* at 145. It didn't hold that the Sixth Amendment compelled district courts to do anything. *See United States v. Braxton*, 784 F.3d 240, 247 (4th Cir. 2015). Of course, *Frye* advised district courts to consider putting the plea offer on the record to avoid self-serving or fabricated ineffective-assistance-of-counsel claims down the road. *Frye*, 566 U.S. at 146. Doing so ensures that a defendant cannot claim on appeal that he was unaware of a plea offer with terms more favorable than the sentence he ultimately received.

*Id.* But recommendations of the Court for best practices to avoid frivolous claims are neither holdings nor constitutional commandments. Therefore, Drew's challenge fails.

B.

Relatedly, Drew argues that his counsel provided ineffective assistance during plea negotiations. Drew claims that his counsel failed to notify the court that Drew had in fact accepted the August plea agreement. Drew adds that his counsel failed to properly advise him of this "advantageous plea offer." Appellant Br. at 32.

We normally assess ineffective-assistance-of-counsel claims through habeas proceedings, not on direct appeal. *See, e.g.*, *Carson v. United States*, 88 F.4th 633 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2548 (2024), *reh'g denied*, 144 S. Ct. 2702 (2024). There's no reason to depart from that normal practice here, since the record isn't developed enough to evaluate Drew's claim. *See Massaro v. United States*, 538 U.S. 500, 504–05 (2003). For example, the government's motion to supplement the appellate record with emails postdating the August hearing—which may be relevant to Drew's ineffective-assistance claim about counsel's pre-trial conduct—remains pending. So, we decline to resolve Drew's ineffective-assistance claim on direct appeal.

C.

Next, Drew appeals the district court's denial of his motion for a continuance. He points out that after his old counsel withdrew, his new counsel had only forty days to prepare for trial. Drew contends that forty days wasn't nearly enough time to adequately prepare. After all, says Drew, his counsel had to review forty-five days' worth of security camera footage, and the government had yet to share it with his new counsel.

When deciding whether to grant continuances, district courts have "broad discretion." *United States v. Walden*, 625 F.3d 961, 964 (6th Cir. 2010). So we review a district court's denial

of a continuance for an abuse of discretion. *United States v. Lewis*, 605 F.3d 395, 401 (6th Cir. 2010). A district court abuses its discretion, for example, if it arbitrarily insists "upon expeditiousness in the face of a justifiable request for delay." *Id.* (citation omitted).

Here, the district court's decision not to delay the trial wasn't "unreasoned and arbitrary." *Walden*, 625 F.3d at 694. Several reasons support the district court's decision. When the evidence is not especially complex relative to the time counsel has to prepare, a denial of a continuance may be warranted. *See, e.g.*, *United States v. Gulley*, 780 F. App'x 275, 285 (6th Cir. 2019). Here, the district judge reasoned that the evidence wasn't particularly complicated; it basically consisted of testimony and video footage. While review of the footage was certainly a daunting task, as the district court acknowledged, it was not quite as daunting as Drew represents. There were not forty-five full days of footage to be reviewed. The footage had been collected over a forty-five-day span, but the camera used was motion-activated and only collected footage of short periods of time when there was activity at the house.

Further, Drew's counsel "presumably had access to the fruits of [his previous] counsel's earlier preparation efforts." *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984). Drew argues that there were no such efforts by previous counsel, since his prior counsel didn't file any motions or challenge the admissibility of any of the government's evidence. And, says Drew, his new counsel did not use any fruits of his earlier counsel's supposed preparation at trial. But the fact that earlier counsel did not file certain motions or raise certain challenges does not mean that he left the new counsel operating from a blank slate.

There were also reasons to proceed to trial in a timely manner. The court's logistical preparations were already underway—including the summoning of over 100 jurors. Drew's co-defendant was prepared to go to trial, and severance at that stage would impose a burden upon

witnesses common to both defendants. This was not simply an unreasoned insistence upon expediency.

There is "[n]o absolute rule . . . as to the minimum amount of time required for an adequate preparation for trial of a criminal case." *United States v. Warshak*, 631 F.3d 266, 298 (6th Cir. 2010) (citation omitted). Thus, while it would have been reasonable to give an extension in these circumstances, when we consider the record as a whole the district judge didn't abuse his discretion in concluding that forty days sufficed.

D.

Drew next challenges a jury instruction regarding the charge of possession with intent to distribute controlled substances.

The district court instructed the jurors that Drew could be convicted of possession with intent to distribute fentanyl if they found another member of the drug conspiracy possessed fentanyl with the intent to distribute it—and that such possession with intent to distribute was a reasonably foreseeable consequence of the conspiracy, fell within the scope of the conspiracy, and was done in furtherance of the conspiracy. That instruction tracked binding precedent on co-conspirator liability. *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946); *United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020).

But Drew argues this instruction was erroneous because he was never charged with a conspiracy with respect to the possession with intent to distribute count, and he alleges there wasn't enough evidence that he was a member of any such drug conspiracy. Drew's arguments fail.

We review the legal accuracy of jury instructions de novo. *United States v. Reed*, 72 F.4th 174, 184 (6th Cir. 2023). Here, contrary to Drew's claim, he was indeed charged with a conspiracy. His original indictment charged him with conspiracy to distribute and possess with

intent to distribute controlled substances. And that indictment was consolidated for trial with the second indictment charging him with possession with intent to distribute controlled substances. Thus, the cases were "tried together as though brought in a single indictment." Fed. R. Crim. P. 13.

At any rate, a district court may provide a *Pinkerton* instruction—even when the defendant is not charged with a conspiracy—provided that "there was sufficient evidence that a conspiracy existed." *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2007). Here, there was sufficient evidence of a conspiracy to possess controlled substances with the intent to distribute them.

Consider some of the evidence linking Drew to other members of the conspiracy and their drug possession and distribution. There was video of Drew accessing the East 89th Street house with a key and selling drugs in the house's driveway. Drew did this multiple times. The East 89th Street home contained large amounts of fentanyl. There were phone recordings of Drew discussing drugs and GPS trackers with Brandon Bryant. A customer testified about scheduling a drug purchase with one member of the conspiracy which Drew then completed. Similarly, another customer testified about how if Fair or Nathaniel Lightfoot (another member of the conspiracy) weren't around to sell her drugs, Drew "was able to get us what we needed." R. 693, Pg. ID 6760. The customer added that Fair, Lightfoot, and Drew all sold the same "batch" of drugs that "looked identical" and "taste[d] the same," and all three sold the drugs out of the same house on East 89th Street. *Id.* at Pg. ID 6754–55. And Special Agent Todd Platt—the case agent—testified that the conspiracy members used a single "customer phone" for transactions, and that Drew sometimes answered that phone.

In short, there was sufficient evidence that a conspiracy existed, so the district court didn't err in issuing the *Pinkerton* instruction.

E.

Drew also objects to Agent Platt's trial testimony. Platt had decades of experience as an FBI agent and was an expert in wiretaps. During the trial, Platt offered extensive testimony about the drug scheme, slang terminology, voice identification, and the like.

First, Drew argues that the district court wrongly allowed Platt to intertwine expert testimony with lay testimony. Second, he claims that the government didn't establish a proper foundation for the portion of Platt's testimony in which Platt identified the voices of various co-conspirators on phone calls and interpreted various pieces of drug-related terminology.

In assessing Drew's challenges, we review the district court's admission of both expert and lay testimony for an abuse of discretion. *United States v. Gardner*, 32 F.4th 504, 519 (6th Cir. 2022) (expert); *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (lay). And even if the district court abused its discretion, we would reverse only if that abuse affected the party's substantial rights. Fed. R. Evid. 103(a); *Gardner*, 32 F.4th at 519; *White*, 492 F.3d at 398. The district court did not abuse its discretion.

1.

Drew's challenge to the intertwining of Platt's expert and lay testimony fails. Platt offered his expert opinions about the drug-trafficking industry based on his years of experience in law enforcement. Among other things, Platt told jurors the "street value" of various drugs and interpreted coded language that drug dealers use. R. 679, Pg. ID 5696. Agent Platt also testified, as a lay fact witness, that he personally witnessed, or participated in, key events in the case. For

example, he testified that he executed a search warrant for one of the drug houses, where he and his team seized fentanyl and other contraband.

A district court can allow a witness to testify in both an expert and a lay capacity provided that the court puts the jury on notice of the witness's "dual role." *United States v. Barron*, 940 F.3d 903, 920 (6th Cir. 2019). One way of putting the jury on notice is through a cautionary jury instruction. *Id.* In *Barron*, for instance, we approved an instruction informing the jury that law enforcement officers had "testified to both facts and opinions" and advising the jury to give each type of testimony its "proper weight" when that instruction was accompanied by an explanation of the appropriate weight to give each type of testimony. *Id.* at 920–21.

Here, the court gave the jury an adequate cautionary instruction. The court told the jury that Agent Platt had "testified to both facts and opinions." R. 698, Pg. ID 7150. The court then instructed the jury to give each type of testimony its "proper weight." *Id.* The court explained how the jury should evaluate factual testimony and how the jury should evaluate opinion testimony immediately thereafter. *Id.* This is materially identical to the instruction we approved in *Barron*. And, notably, the relevant instruction is also the Sixth Circuit pattern instruction.

The district court's use of these instructions wasn't an abuse of discretion. *See Barron*, 940 F.3d at 920–21.

2.

Drew also argues that the government did not lay a proper foundation for Platt's testimony. Specifically, he contends that (1) Platt didn't explain how he identified people (like Drew) on calls, (2) Platt's interpretations of various recorded conversations "weren't based upon well-known drug language," and (3) Platt "failed to explain the basis of his opinions or his methodology being his

training or experience and/or personal knowledge when coming to his sweeping conclusions." Appellant Br. at 53.

Drew's contention that Platt failed to explain how he identified callers such as Drew is unfounded. Platt walked through how he identified a caller's voice as Drew's: through telephone records and license plate cross-checks, as well as having personally talked to Drew himself. That sufficed. *See Gardner*, 32 F.4th at 521 (witness need only have heard alleged speaker's voice "at *any* time" to make a voice identification) (citation omitted).

As for Drew's second contention (regarding the drug terminology), Drew seems to be drawing on our precedent distinguishing between admissible expert testimony about slang and coded language and inadmissible expert testimony interpreting plain English (though he doesn't cite that precedent). *Compare id.* at 519–20 (explaining that an expert may be helpful to the jury in decoding "cryptic 'drug dealing' slang" (citation omitted)), *with United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) (disapproving of law enforcement experts "spoon-feeding" their own interpretations of "ordinary English language" to the jury). Yet Drew does not tell us which of Platt's interpretations, if any, "weren't based upon well-known drug language." Appellant Br. at 53. That omission is fatal since we aren't obligated to construct Drew's arguments for him. *See United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016) (stating that "a party may not raise an issue on appeal by mentioning it in the most skeletal way, leaving the court to put flesh on its bones" (cleaned up)). Because of the same issue of underdevelopment, Drew has forfeited his third argument about Platt's supposed wholesale failure to explain the basis of his opinions as well.

F.

Drew next argues that there was insufficient evidence for the jury to convict him of (1) possession with intent to distribute controlled substances (from the second indictment) and (2) conspiracy to distribute and possess with the intent to distribute controlled substances (from the first indictment).

In assessing Drew's sufficiency challenges, we remember that it's not our job to find facts, weigh evidence, and draw inferences. The Constitution entrusts the jury with those responsibilities. *Musacchio v. United States*, 577 U.S. 237, 243 (2016). As an appellate court, our task is more modest. We merely ensure that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). Demonstrating that no rational trier of fact could have found the essential elements of the crime is a "demanding legal standard." *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). Drew can clear this high bar only if "the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio*, 577 U.S. at 243 (citation omitted).

We take each of Drew's sufficiency challenges in turn.

1.

To convict a defendant of possession with intent to distribute controlled substances under 21 U.S.C. § 841(a)(1), the government must prove that the defendant "(1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it." *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010). And under the *Pinkerton* theory of liability described above, Drew could be convicted of his co-conspirators' possession with intent to distribute controlled substances if their possession was done in furtherance of the conspiracy, fell within its scope, and

- 13 -

was a reasonably foreseeable consequence of the conspiracy. *United States v. Sadler*, 24 F.4th 515, 545 (6th Cir. 2022).

Just as there was enough evidence that Drew was involved in a conspiracy to distribute drugs for the district judge to issue a jury instruction to that effect, *see supra* Part II.D, there was enough evidence of Drew's guilt to sustain a guilty verdict under *Pinkerton*. Recall some of the evidence linking Drew to the conspiracy and the East 89th Street house with its large batch of fentanyl: customers testified about calling one conspiracy member to buy drugs and then Drew showing up to complete the transaction; Drew answered the "customer phone"; there was video of Drew entering the East 89th Street residence with a key and selling drugs in its driveway; and customers testified about purchasing fentanyl from Drew at the 89th Street residence. In sum, there was enough evidence that Drew was in fact a member of a conspiracy to possess and distribute drugs—including out of the 89th Street residence.

Meanwhile, the government presented evidence of other members of the conspiracy possessing and selling drugs out of the East 89th Street house. There is no meaningful dispute that such activities were not in furtherance of the conspiracy, within its scope, and reasonably foreseeable. Therefore, Drew's sufficiency challenge to his possession with intent to distribute conviction comes up short.

2.

Drew's sufficiency challenge to his conspiracy conviction also fails for the same reasons that doomed his challenge to the *Pinkerton* jury instruction—including the phone calls and coordinated drug sales. *See supra* Part II.D. Although Drew argues he was acting alone, there was sufficient evidence for a jury to conclude otherwise.

G.

Turning to Drew's arguments about his sentence, we first assess his challenges to the district court's calculation of the Guidelines range. Each comes up short.

1.

First, Drew argues that the district court erred in calculating his base offense level. Base offense levels under the Guidelines correspond with the severity of a crime: the more serious the crime, the higher the base offense level. When it comes to drug crimes like Drew's, the amount of drugs "assigned to a defendant" based on a preponderance of the evidence dictates his base offense level. *Gardner*, 32 F.4th at 524. The more drugs, the higher the base offense level. *See* U.S.S.G. § 2D1.1(c). Here, the district court determined that Drew's base offense level was 30. It reached that calculation because in a special verdict form, the jury had found Drew guilty beyond a reasonable doubt of possessing with intent to distribute 400 grams or more of a fentanyl mixture. The Guidelines provide for a base offense level of 30 for 400 grams or more of fentanyl. *Id.* § 2D1.1(c)(5). Had the district court calculated a lower base offense level, it would have been departing from the jury's beyond-a-reasonable-doubt finding.

In response, Drew argues that there was insufficient evidence to tie him to (1) the East 109th Street house and (2) the East 89th Street house. Even if the former were true, it would not matter because the amounts found at the East 89th Street house alone put Drew above 400 grams and into a base offense level of at least 30. *Id.* §§ 2D1.1(a)(5), (c)(4). And the latter assertion is wrong for the same reasons discussed above in relation to Drew's *Pinkerton* instruction and sufficiency challenges: there was ample evidence to connect Drew to these drugs.

2.

Next, Drew argues the district court was wrong to impose a 2-level drug premises enhancement. The Guidelines call for a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id.* § 2D1.1(b)(12). This enhancement applies to "anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).

Specifically, Drew argues that he shouldn't be held responsible for maintaining the East 89th Street residence. So we're left focusing on what qualifies as "maintenance" of a premises.

A defendant need not have a formal, possessory interest in the premises to qualify for the enhancement; de facto control over the premises during a drug transaction suffices. *United States v. Taylor*, 85 F.4th 386, 389–90 (6th Cir. 2023). And that de facto control "need not be either exclusive or continuous." *Id.* at 390. In *Taylor*, for instance, the defendant threatened and coerced his girlfriend into allowing him and others to store large amounts of drugs at her residence. *Id.* The defendant did not have a key to his girlfriend's house, but he "would tell [his girlfriend] when he needed access to the house and she would leave it unlocked" in light of his threats. *Id.* at 389. In short, the threat-induced compliance of the defendant's girlfriend served as a key to her home— giving him access to the premises whenever he needed access. That was enough de facto control for the enhancement to apply. *Id.*

Given these standards, there was enough evidence for the district court to find that Drew knowingly maintained the East 89th Street premises. Recall that Drew had key access to the residence, was seen repeatedly entering and leaving, and sold drugs out of the residence's

driveway. The district court was correct to find sufficient evidence of de facto control for the drug premises enhancement.

Further, even if Drew himself had not maintained the East 89th Street residence, a co-conspirator's maintenance of a premises for the purpose of manufacturing or distributing controlled substances is enough for the court to apply the enhancement where the maintenance of the premises was within the scope of the jointly undertaken criminal activity, it was done in furtherance of the activity, and it was reasonably foreseeable that such maintenance would occur in connection with the activity. *See United States v. Rich*, 14 F.4th 489, 495–97 (6th Cir. 2021).

As discussed above, there was ample evidence to establish that Drew was a part of a drug trafficking conspiracy operating out of these two houses. As a result, there was sufficient evidence to conclude that at least one of the conspirators accessed the houses and used them to store the drugs within the scope of and in furtherance of the conspiracy. And it is foreseeable that a conspiracy to sell drugs out of two houses will involve the maintenance of those houses as drug premises. Therefore, application of the enhancement was appropriate.

3.

Drew next challenges the two-level enhancement that the district court imposed for possession of a dangerous weapon during Drew's drug trafficking offense. *See* U.S.S.G. § 2D1.1(b)(1). The district court imposed this enhancement because the search of the East 89th Street residence turned up two loaded firearms near the stash of fentanyl, as well as other guns and ammunition in the house.

For the enhancement to apply, the government must show by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) the weapon was possessed during and in connection with "relevant conduct" to the offense. *United*

*States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (citation omitted); U.S.S.G. § 2D1.1 cmt. n.11. When a co-conspirator possesses the weapon, the enhancement applies if the government establishes that possession of a dangerous weapon was within the scope of the jointly undertaken criminal activity; in furtherance of that criminal activity; and reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3(a)(1)(B)(i)–(iii); *cf. Pinkerton*, 328 U.S. at 646–48. For purposes of this co-conspirator theory of weapons possession, we review the district court's factual findings for clear error. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018); *Barron*, 940 F.3d at 912.

Here, given the proximity of the firearms to the large amounts of fentanyl, there was enough evidence for the district court to conclude that a co-conspirator possessed a dangerous weapon in connection with the drug trafficking (and, therefore, the drug trafficking conspiracy). Drew argues that he can't be held liable for others' possession of the firearm because he claims he wasn't charged with conspiracy. But, as discussed above, he was charged with conspiracy in the merged indictment.

Thus, the only remaining question is whether the co-conspirator's possession of the gun was reasonably foreseeable to Drew. It is not always foreseeable that a co-conspirator will possess a firearm in any drug conspiracy. *United States v. Woods*, 604 F.3d 286, 291 (6th Cir. 2010) (collecting cases). The government can show that the co-conspirator's possession of the firearm was foreseeable either by showing that there were enough drugs in a single location that the quantity alone supported the inference that firearms would be foreseeably used for protection or by showing "additional evidence that defendant expected a firearm to be present." *Id.* Generally, the quantity of drugs will make it foreseeable that firearms will be present where the organization is moving tens of thousands of dollars of drugs through a single space. *Id.* (collecting cases in

which over $60,000 of drugs were moved through a single location). Here, the house in which the firearms were found was one of just a few houses out of which the conspiracy was selling enough drugs to generate cash profits in the hundreds of thousands. It was foreseeable that a weapon would be possessed in furtherance of the conspiracy at some point during the conspiracy.

Drew also argues that a recent amendment to the Guidelines precludes application of the § 2D1.1(b) firearms enhancement here. Specifically, § 1B1.3(c) provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). Drew argues that the fact that the jury didn't convict him on the felon in possession charge means that the firearm possession can't be "relevant conduct" in light of § 1B1.3(c)—i.e., that the hung jury amounts to an acquittal. Drew's point could matter because the application of specific offense characteristics like the two-level firearm enhancement in § 2D1.1(b) hinges on the offense characteristic's being "relevant conduct" under § 1B1.3. *See* U.S.S.G. § 1B1.3(a).

But the language regarding acquitted conduct in § 1B1.3(c) is inapplicable here because Drew was not acquitted of illegally possessing a firearm. A hung jury makes for neither a conviction nor an acquittal. In the Double Jeopardy Clause context, for example, the Supreme Court has expressly distinguished hung juries (which can trigger retrials) and acquittals (which cannot). *Richardson v. United States*, 468 U.S. 317, 323–25 (1984). In doing so, the Court has rejected the notion that "a hung jury is the equivalent of an acquittal." *Id.* at 325. An acquittal resolves a criminal case; a hung jury does not. *Cf. Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003) (characterizing a hung jury as a "non-result" that "cannot fairly be called an acquittal").

4.

Drew's final procedural challenge to his Guidelines range centers on his criminal history category. Drew argues that the district court wrongly assigned him three criminal history points each for two prior convictions—(1) a state conviction for trafficking cocaine and (2) a state conviction for involuntary manslaughter in commission of a felony and felonious assault. Both sentences were imposed on the same day.

Drew's argument hinges on U.S.S.G. § 4A1.2(a)(2), which instructs district courts to count prior sentences separately for purposes of calculating criminal history points if an "intervening arrest" separated the two offenses. U.S.S.G. § 4A1.2(a)(2). In other words, if the defendant was arrested for the first offense before committing the second offense, each sentence is counted separately. *Id.* Drew contends there was no intervening arrest for his cocaine trafficking offense before he committed involuntary manslaughter and felonious assault. So, he concludes, each offense should not have been scored separately.

Drew is wrong. An "arrest" under § 4A1.2(a)(2) "requires placing someone in police custody as part of a criminal investigation." *United States v. Rogers*, 86 F.4th 259, 264 (6th Cir. 2023). Although *Rogers* had yet to be decided at the time of Drew's sentencing, the district court found that Drew was "held in custody" on March 5, 2001 in connection with his cocaine trafficking offenses before he committed the manslaughter and felony assault. R. 1013, Pg. ID 9833. We review such findings of fact for clear error. *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012).

Here, there was enough evidence for the district court to conclude that Drew had been held in police custody for trafficking cocaine. Drew's presentence report noted that he "was arrested on March 5, 2001," for the cocaine trafficking. R. 836, Pg. ID 8659. And at the sentencing hearing,

the government produced an arrest report demonstrating that Drew was arrested for the cocaine trafficking on March 5, 2001. The report then listed his arrest disposition as "straight released," and it listed the date of that disposition as March 6, 2001. As the district court explained, the report thus "indicates that the defendant was held for some period of time." R. 1013, Pg. ID 9833. Further, as the district court noted at sentencing, "there was an arrest because there is an arrest report." *Id.* Police generally do not create arrest reports for routine interactions with members of the public, meaning that the presence of an arrest report gives rise to the inference that Drew was, indeed, arrested. In addition to the arrest report, the government produced a state criminal history report for Drew that included an "arrest/offense date" of March 5, 2001, for a state drug law violation. R. 993-2, Pg. ID 9693.

Drew argues that there is no evidence that he "was handcuffed, taken into custody, informed that he was under arrest, or taken to any place to be held during a time." Appellant Br. at 45. In support of this argument, Drew offered a statement from the Cuyahoga County Sheriff asserting that Drew had not been held in the county jail on March 5 or March 6 at the sentencing hearing. But the fact that there's no record that Drew was held in jail pursuant to this arrest is immaterial—what's needed is "police custody," not a stay in a prison cell. *Rogers*, 86 F.4th at 264; *see also* R. 1013, Pg. ID 9834 (noting that although Drew "may not have been held in the county jail," there was an arrest because "he was held"). Therefore, the district court's conclusion that there was an intervening arrest was not clearly erroneous. That "ends" our § 4A1.2(a)(2) "inquiry" and supports assigning separate points to each offense. *United States v. Tatum*, 743 F. App'x 589, 594 (6th Cir. 2018).

Drew's invocation of *United States v. Powell*, 798 F.3d 431 (6th Cir. 2015), is unavailing. In *Powell*, the defendant was in court for an unrelated charge when he "was served with a summons

and given notice of an aggravated-assault charge against him." 798 F.3d at 437. A couple of months later, the defendant was arrested for a distinct felony—assaulting a police officer. *Id.* He was sentenced for both the aggravated assault and the assault of the police officer on the same day. *Id.* We concluded that the summons didn't qualify as an intervening arrest. *Id.* at 440. But unlike in *Powell*, the district court's assignment of separate points in this case didn't rest on an intervening summons or citation; it rested on evidence of an intervening arrest.

H.

Drew's final set of challenges go to the district court's upward variance of his sentence from the Guidelines range. The district court calculated Drew's Guidelines range as 235 to 293 months. The court then upwardly varied his criminal history category from V to VI, such that his new range was 262 to 327 months. The court then imposed a sentence of 327 months. In explaining the variance, the district judge pointed to Drew's extensive criminal history and his opinion that Drew's Guidelines range didn't adequately capture his violent past. Drew brings both a procedural and a substantive challenge to the upward variance.

1.

Drew contends that the district court's decision to upwardly vary was procedurally unreasonable because the court didn't give him any notice that it was considering such a variance.

The relevant rule here is Federal Rule of Criminal Procedure 32, which requires a sentencing court to give the defendant a summary of "any information excluded from the presentence report under Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information." Fed. R. Crim. P. 32(i)(1)(B). Rule 32(d)(3), in turn, allows for exclusions from the presentence report of certain diagnoses,

confidential information, and other information that could harm the defendant or others if disclosed. *See* Fed. R. Crim. P. 32(d)(3).

So, under Rule 32, the sentencing court must notify the defendant if it plans to rely on information not contained in the presentence report. But here, the presentence report contained the information supporting the upward variance—Drew's extensive criminal history. In addition, the draft presentence report expressly recommended an upward departure or variance, in part because the Guidelines range didn't fully account for Drew's violent past. What's more, Drew objected to that exact recommendation before sentencing, and the probation office's final presentence report contained the same information. So, Rule 32's notification provision was satisfied here: the relevant information was in the presentence report.

Drew's invocation of *United States v. Coppenger*, 775 F.3d 799 (6th Cir. 2015), doesn't change the fact that his case falls well outside the purview of Rule 32's notice requirement. In that case, the defendant had pled guilty to conspiracy to commit bank fraud and conspiracy to defraud the United States of income taxes. *Id.* at 802. Both the government and the defendant sought a sentence within the Guidelines range of 78 to 97 months because of the defendant's assistance to authorities. *Id.* But "the district court relied on confidential, undisclosed information from co-conspirators' presentence reports to vary upward from this range." *Id.* Critically, that information supporting the variance "was neither signaled in the presentence report nor otherwise reasonably foreseeable." *Id.* at 804. Not so here. Unlike the defendant in *Coppenger*, Drew had "a meaningful opportunity to respond to the factual bases for the variance." *Id.* at 806. In fact, he did exactly that by objecting to the PSR's recommendation for an upward variance.

2.

Along with the procedural angle, Drew challenges the substantive reasonableness of his sentence. A district court's sentence is substantively unreasonable only if the court "abused its significant discretion." *United States v. Thomas*, 933 F.3d 605, 613 (6th Cir. 2019). So, in assessing Drew's challenge, we're deferential: "Reasoned judgments about the appropriate length of a sentence are largely for trial courts, not appellate courts." *United States v. Johnson*, 934 F.3d 498, 502 (6th Cir. 2019). It's the district court's job to weigh the § 3553(a) factors, not ours. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). Thus, a sentence like Drew's that falls outside the Guidelines range is not presumptively unreasonable. *Irizarry v. United States*, 553 U.S. 708, 714 (2008).

The district judge "properly considered all of the factors, balanced them, and imposed a reasonable sentence." *Rayyan*, 885 F.3d at 443. For example, the judge considered the fact that Drew is a recidivist, as demonstrated by his "lengthy [criminal] record" and "record of violence." R. 1013, Pg. ID 9851. The judge also explained that the calculated range didn't "adequately address" Drew's "violent nature." *Id.* at Pg. ID 9853. In short, there's "no basis for second guessing" the district court's judgment here. *Rayyan*, 885 F.3d at 443.

\*   \*   \*

We affirm.